## No. 27028

**Twin Lakes Reservoir & Canal Company v. City of Aspen, Board of Commissioners of the County of Pitkin, Colorado Rivers Council, Colorado Council of Trout Unlimited, Crystal Valley Environmental Protection Association**

(557 P.2d 825)

Decided December 13, 1976. Rehearing denied January 3, 1977.

210 

Holland and Hart, John Undem Carlson, James E. Boicourt, Lawrence L. Fenton, for plaintiff-appellant.

Vranesh and Musick, John D. Musick, Jr.; Sandra Stuller, City Attorney; Richard Wood, County Attorney; Fitzhugh Scott, III; J. E. Devilbiss, for defendants-appellees.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

This case is here on the denial of an application for a conditional water right by the Water Judge of Colorado's Water Division No. 5. Involved are proposed increases of conditional decrees for some of the component parts of the Independence Pass Transmountain Diversion System ("IPTDS"). The applicant and operator of the system is the appellant Twin Lakes Reservoir and Canal Company ("Twin Lakes"). We reverse.

Twin Lakes diverts water from streams constituting the headwaters of the Roaring Fork River (a tributary of the Colorado River) in Western Colorado through a tunnel to the Arkansas River basin. This tunnel, called Tunnel No. 1, is in the area of State Highway 82 near Independence Pass. The west portal or inlet of Tunnel No. 1 is at the Grizzly Reservoir. This reservoir was created by a dam across Lincoln Gulch, a short distance downstream from a point at which Grizzly Creek flows into the gulch. From the east portal of the tunnel water flows into Lake Creek and thence to Twin Lakes Reservoir. From Twin Lakes Reservoir it proceeds toward and to the Arkansas River and is used far downstream for irrigation of agricultural areas some distance east of Pueblo, Colorado. Twin

Lakes has an absolute decree for 54,458 acre-feet once each year in Twin Lakes Reservoir.

When friction of the water against the tunnel lining lessens, the maximum flow of Tunnel No. 1 is expected to be 625 cubic feet of water per second of time (c.f.s.). By decree entered in 1936, Twin Lakes was awarded a decree for Tunnel No. 1 of 367 c.f.s. absolutely and 258 c.f.s. conditionally, with priority date of August 23, 1930. In 1944 137 c.f.s of the conditionally decreed water was made absolute and, thus, Tunnel No. 1 then had a decree for 504 c.f.s. absolute and 121 c.f.s. conditional.

In early 1974 the adjudicating court[1] found that recently Twin Lakes had expended over a million and a half dollars in the continuing construction of its water gathering and transportation system, including the completion of all concrete lining in Tunnel No. 1. It awarded to Tunnel No. 1 as an absolute decree all but 15 c.f.s. of the water conditionally decreed thereto. Thus, there is now a decree to Tunnel No. 1 of 610 c.f.s. absolutely and 15 c.f.s. conditionally.

Twin Lakes' gathering system of water transported through Tunnel No. 1 is rather extensive and consists of three segments, the flow in each of which ends in Grizzly Reservoir: (1) streams (Lincoln Gulch and Grizzly Creek) naturally flowing into Grizzly Reservoir; (2) the New York Collection Canal; and (3) the Roaring Fork Component (taking the water directly from the Roaring Fork River and from its tributary, Lost Man Creek).

We have not noted in the record any water separately decreed to the tributaries of Grizzly Reservoir, and assume that priorities relating to this particular water are embraced within the decrees relating to Tunnel No. 1.

The New York Collection Canal and the Roaring Fork segment each have a number of component parts. The 1936 decree awarded conditional decrees to the water from each of these component parts. The conditional decrees as to the New York Collection Canal provided for 171 c.f.s. for the last component part of this segment, being the flowage directly to the Grizzly Reservoir. As to the Roaring Fork segment, the Roaring Fork River component was awarded 370 c.f.s., and the Lost Man Creek component 275 c.f.s. The total of these conditional decrees relating to the New York Collection Canal and the Roaring Fork River segment is 716 c.f.s., in addition to water naturally flowing into Grizzly Reservoir. These obviously exceed the ultimate limitation on the system of 610 c.f.s. absolute and 15 c.f.s. conditional awarded Tunnel No. 1. None of the conditional decrees to the component parts have been made absolute, and they remain

---

[1] Water adjudications have always been under the jurisdiction of our district courts. The Water Right Determination and Administration Act of 1969 (sections 37-92-101 *et seq.*, C.R.S. 1973) placed this jurisdiction in seven geographical water divisions of the district court. The instant matter is under the jurisdiction of Water Division No. 5.

conditional. Twin Lakes' purpose has been to take available conditionally decreed water from the component parts to achieve maximum carriage through Tunnel No. 1. It is apparent that throughout the history of this project, it has been the desire of Twin Lakes to take all the water it could possibly obtain through the collection system up to the maximum of 625 c.f.s.

Prior to the institution of the proceedings which culminated in the 1936 decree and on June 12, 1933, Twin Lakes entered into an agreement with the Roaring Fork Water Users' Association relating to the project to be constructed. This provided for "the use of the waters of the Roaring Fork River, and its tributaries so that the waters might be used and appropriated to the greatest advantage by all parties interested therein . . . ." This agreement was introduced in evidence in the adjudication proceedings and the substance thereof was approved in the 1936 decree.

The testimony in the instant proceeding was that, "the Company intended from the outset to take the full amount of water available there . . . . [and] intended to take whatever the production was from day one." This testimony was without conflict.

In 1944 the district court entered a decree declaring that Twin Lakes had exercised diligence in connection with its conditional decrees and it awarded an increase in the amount absolutely decreed to Tunnel No. 1. In this decree it was stated that Twin Lakes
"had continuously and diligently prosecuted the work necessary to complete the various units of its 'Independence Pass Transmountain Diversion System', and is still so engaged so as to enable it eventually to divert, appropriate and use for the beneficial purposes *the entire quantity of water awarded to it by said decree*, to-wit: 625 cubic feet of water per second of time." (Emphasis added.)

The water judge in the instant matter stated that the
"purpose of the present Application is to assure [Twin Lakes] that it has a decreed right to all water which it can physically gather for diversion through its Tunnel No. 1 which, as stated above, has a decreed capacity of 625 c.f.s. and is not to be enlarged."

Until recent years, Twin Lakes' board of directors and management believed that the conditional decrees awarded to each of the component parts at least equalled the maximum capacities to be gathered from each of those parts. In the early 1970's the board began to question its belief and had some studies made. These developed that, in fact, more than 171 c.f.s. had at times flowed from the New York Collection Canal system to Grizzly Reservoir. As a result, on April 30, 1973 Twin Lakes filed its application for further conditional decrees for the component parts of the New York Collection Canal. Without going into detail as to these component parts, the application asked for a conditional decree to an additional 100 c.f.s., or an aggregate of 271 c.f.s., of water proceeding from the New

York Collection Canal to Grizzly Reservoir.

The record indicates that any portion of the additional 100 c.f.s. would be needed only under rather exceptional circumstances, and then only for a period of a week or two. Such an exceptional circumstance would occur only during flood season when for some reason there would be a "system failure" or an avalanche on one segment of the collection system or a "diurnal fluctuation" (by which the witness meant an abnormal heating of certain slopes in the morning and others in the afternoon with resulting unusual snow melt). This application asked for a priority date of August 23, 1930 (the same as that specified in the 1936 decree) but at the hearing Twin Lakes asked that its priority date be changed to April 30, 1973, the date of filing of the application. Thus, no "relation back" of the conditional priority was requested.

The water judge denied the application. In doing so he stated that he had concluded that Twin Lakes "did not have the requisite bona fide intent to appropriate an additional 100 c.f.s. . . . on August 23, 1930 . . . or at any time thereafter down to and including the date on which this Application was filed." He also made the following conclusion:

"Given the limited capacity of Tunnel No. 1 with no intention to enlarge it, the Applicant clearly can adjust the water supply from the three main components of its system by a Plan of Augmentation or the use of alternate points of diversion as provided by the Water Right Determination and Administration Act . . . The facilities will not accommodate any more water and, as pointed out above, the means are available for the Applicant to adjudicate its collection structures to accomplish this purpose."

Earlier in this ruling the water judge stated:

"For some reason, which is obscure to say the least, in none of the decrees which gradually made absolute 610 c.f.s. of the 625 c.f.s. decreed to Tunnel No.1 was there any action taken to make absolute the conditional decrees for the structures which gather and funnel the supplemental waters to the Grizzly Creek Reservoir, although they obviously have been constructed and in use for many years. Nor, so far as the Court can determine from the files in these cases, was the amount of water absolutely decreed, from time to time, to the tunnel broken down between the three main sources of supply for the system."

It has always been the Colorado law that, in order to initiate an appropriation of water, there must be a "first step" consisting of (1) an intent to appropriate and (2) an open, physical demonstration indicating that intent. *Sieber v. Frink*, 7 Colo. 148, 2 P. 901 (1883); and *Larimer County Reservoir Co. v. People, ex rel. Luthe*, 8 Colo. 614, 9 P. 794 (1885). For more recent expressions of the rule *see Central Colorado Water Conservation District v. Denver*, 189 Colo. 272, 539 P.2d 1270 (1975); *Elk-Rifle Water Co. v. Templeton*, 173 Colo. 438, 484 P.2d 1211 (1971); *Four Counties Water Users Ass'n v. Colorado River*

*Water Conservation Dist.*, 159 Colo. 499, 414 P.2d 469 (1966); and *In the Matter of the Application of Mills E. Bunger,* 192 Colo. 159, 557 P.2d 389.

■ The appellees argue that the evidence does not show an intent on the part of Twin Lakes to make this particular appropriation, and that even the filing of the application does not evidence this intent. The appellees urge, erroneously, that *Central Colorado Water Conservation Dist. v. Denver, supra*, indicates support of this proposition. The water judge seemed to agree with this argument. This court did not so rule in *Central Colorado*. It is rather obvious that the filing of an application for adjudication of a water right may be evidence that the applicant at or prior to the time of filing formed an intent to appropriate water as claimed. Under the circumstances here, the fact of filing was evidence of that intent.

As during the hearing Twin Lakes concluded to ask for a priority date of April 30, 1973 (the date of filing the application), we need not approach the academic question of whether Twin Lakes' intention to obtain all water possible from the component parts within the limitations of the capacity of Tunnel No. 1 would support an earlier date at which the intent was formed.

We now proceed to the second fork of the "first step," being whether there were open, physical acts and, if so, whether they may precede the formation of the intent to make the particular appropriation.

Twin Lakes asserted that it had been demonstrated that the New York Collection Canal would carry more than 171 c.f.s. Mr. Wittemyer was the only witness who testified at the hearing. We have been unable to discover any mention of the fact in the briefs, but he testified that the New York Collection Canal "has the carrying capacity of 100 plus the present amount. . . . [T]hey built a ditch that had 271 foot carrying capacity." If the water judge believed the testimony of Mr. Wittemyer, the testimony is undisputed that there were overt, physical acts in the past making the capacity large enough to carry the additional water claimed conditionally.

■ The question remains, therefore, as to whether these physical acts of Twin Lakes, which occurred long before it realized that the carrying capacity was that large, could be the basis for the requested additional decree. In other words, may the physical acts precede the formation of intention to appropriate the additional water, or must they be coincident or subsequent to the formation of the intent? The answer is that under the situation presented here such physical acts may precede the formation of intention. The appellees appear to argue that *Central Colorado, supra*, stands for the proposition that the act and intent must be coincident. This is predicated upon the statement in *Central Colorado* that a "valid 'first step' is established when an intent to take water is formed, together with an open, overt action on the land giving notice of the intent to apply the

water to a beneficial use." Appellees in their briefs state:

"The opinion [*in Central Colorado*] thereby dispelled the erroneous notion that had unfortunately grown up following the decision in *Elk-Rifle Water Co. v. Templeton, supra,* that the conditional water rights doctrine could be satisfied by the fortuitous existence of earlier actions which happen to conform to the facts of prior decisions of this Court but which were undertaken without the requisite appropriative intent."

*Elk-Rifle* was not modified by *Central Colorado.* As stated in *Central Colorado,* the application of these rules must be made in each case on an *ad hoc* basis. Cited for this proposition were *Four Counties Water Users Ass'n v. Colorado River Water Conservation Dist., supra; Elk-Rifle, supra* and *Rocky Mountain Power Co. v. White River Electric Ass'n,* 151 Colo. 45, 376 P.2d 158 (1962).

In *Elk-Rifle* it was said:

"Elk-Rifle argues, however, that the actions by engineer Jex in the field prior to June 19 could not constitute a valid 'first step' in appropriation, citing *Four Counties, supra,* in which we held that 'an appropriation [is] the intent to take *accompanied* by some open physical demonstration of the intent * * *.' (Emphasis added.) We do not interpret this language to mean that the requisite intent must precede or be contemporaneous with the acts which constitute the work 'on the land.' What is required is that at some point in time the two requirements — the open physical demonstration and the requisite intent to appropriate — co-exist, with the priority date to be set not earlier than the date on which both elements are present."

The statement in *Elk-Rifle* was correct under the facts of that case and the rule announced there is applicable to the present case. The rule announced in *Central Colorado* is a rule governing the situation involved in that case and in similar factual situations.

We do not notice in the record any testimony relating to the additional capacities of the components of the New York Collection Canal upstream from the component which involves the additional 100 c.f.s. For this, as well as other reasons, we think it preferable for us not to set forth the exact contents of the decree to be entered. Rather, we reverse the ruling of the water judge, which was that a bona fide intent to appropriate additional water was not present in this case; and we remand to permit the water judge to enter such a decree which may be appropriate.

The judgment is reversed and the cause remanded with directions as indicated.

MR. JUSTICE LEE, MR. JUSTICE ERICKSON and MR. JUSTICE CARRIGAN dissent.

MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. The water court denied the application for a conditional water decree because it concluded as a matter of law that the Twin Lakes Reservoir and Canal Company had not established the requisite intent to appropriate and the first step toward appropriation.

The purpose of a conditional water decree has always been to allow an ultimate appropriation of water to relate back to the time of the "first step" toward that appropriation. This permits long-term construction projects to be financed and commenced with the security of priority date which will insure available water upon completion of the project. *See Taussig v. Moffat Tunnel Water & Development Co.*, 106 Colo. 384, 106 P.2d 363 (1940); *Metropolitan Suburban Water Users Ass'n v. Colorado River Water Conservation District*, 148 Colo. 173, 365 P.2d 273 (1961); *Four Counties Water Users Ass'n v. Colorado River Water Conservation District*, 159 Colo. 499, 414 P.2d 469 (1966). Accordingly, the "first step" entails two prongs: formation of an intent to appropriate a definite quantity for a definite beneficial use, and an overt manifestation of that intent so that others will have adequate notice. *See Central Water Conservancy District v. City and County of Denver*, 189 Colo. 272, 539 P.2d 1270 (1975); *Baca Irrigating Ditch Co. v. Model Land & Irrigation Co.*, 80 Colo. 398, 252 P. 358 (1927); *Holbrook Irrigation District v. Fort Lyon Canal Co.*, 84 Colo. 174, 269 P. 574 (1928). A guiding principle in applying these elements has been whether the applicant seeks to "invoke the benefit of remote contingencies to unduly extend the doctrine of relation." *Fruitland Irrigation Co. v. Kruemling*, 62 Colo. 160, 162 P. 161 (1916).

The majority opinion departs from the purposes of the doctrine of conditional water rights and the appropriate application of its elements. In so doing, it encourages abuse of the doctrine.

At stake in this case is a conditional water right of 100 c.f.s. for the New York Canal. The canal presently carries a conditional decree for 171 c.f.s. The only evidence of an "intent to appropriate" was the filing of the application for a conditional decree on April 30, 1973. *Compare Central Colorado Water Conservancy Distrct v. City and County of Denver, supra; Oak Creek Power Co. v. Colorado River Conservation District*, 182 Colo. 389, 514 P.2d 323 (1973). The requisite intent must be not merely an intent to appropriate, but an intent to appropriate for a *beneficial use. See, e.g., Larimer County Reservoir Co. v. People*, 8 Colo. 614, 9 P. 794 (1886). The evidence amply supported the conclusion of the water judge and should be affirmed on appeal. *See Central Colorado Water Conservancy District v. City and County of Denver, supra.*

The only evidence of an overt, physical manifestation of the requisite intent was testimony that, in the year 1935, "they built a ditch that had

271 foot carrying capacity." The issue was thus correctly stated by the majority: can physical acts, when performed "long before" the *formation* of the intent to appropriate, provide the basis for a conditional water decree? To accede to that proposition is unwise in several respects:

First and most obvious, it renders meaningless the long-established requirement that an overt physical act accompany the intent to appropriate. As we said in *Fruitland Irrigation Co. v. Kruemling, supra*:

"Certainly the first step demanded by the rule is *nothing short of an open and notorious physical demonstration, conclusively indicating a fixed purpose to diligently pursue and, within a reasonable time, ultimately acquire a right to the use of water*, and as its *primary function is to give notice* to those subsequently desiring to initiate similar rights, it must necessarily be of such a character that they may fairly be said to be thereby charged with at least such notice as would *reasonably be calculated* to put them on inquiry of the prospective extent of the proposed use and consequent demand upon the water supply involved." (Emphasis added.)

The purpose of the act is thus to inform the public of the existence of an intention to appropriate. Under the rule set forth by the majority, the purpose of the act is irrelevant, so long as it fortuitously happens to conform to a subsequently generated intent. This elevates the use of legal fiction, which provided a salutory function in the original doctrine of relation-back, into a logical absurdity which serves no legitimate purpose.

Second, the majority opinion invites litigation and abuse by leaving several questions unresolved. The majority opinion gives no guidance as to *how long* the interim vacuum between the act and the future intention may be. It clearly leaves the matter open-ended by approving a 41-year hiatus in this case. How does one construe an act whose only evident purpose was fulfilled long ago? In this case, the "enlarged" ditch carried its decreed and intended capacity for many years. The record indicated that obvious purposes for the "additional" capacity of the canal were protection from leakage and avalanche damage in the mountainous area. *See Fruitland Irrigation Co. v. Kruemling, supra; Holbrook Irrigation District v. Fort Lyon Canal Co., supra.*

Third, the majority position creates open-ended, lingering clouds on water rights. To allow wholly unrelated physical acts in the distant past to perfect a present, naked intention into a water right is to effectively give developers free preemptive rights over subsequent water allocations.

Fourth, the majority position gives the green light to abuse of the doctrine of conditional water rights. We have carefully considered the potential for overreaching and undue leverage in our past decisions. *See Holbrook Irrigation District v. Fort Lyon Canal Co., supra; Fruitland Irrigation Co. v. Kruemling, supra.* By allowing this departure from reality, where no concurrent or subsequent physical

development is required, the majority endorses the creation of paper rights for phantom appropriations.

Fifth, the complete absence in this case of a meaningful physical element or "first step" signals a gross departure from the policy of conditional water rights. *See Central Colorado Water Conservancy District v. City and County of Denver, supra.* Here no structure was built, no pipeline laid, no earth moved in furtherance of the appropriation. No long-term construction, planned or evident, benefits from the invocation of the doctrine. What remains is only a present intent to take as much water as possible, based upon the fortuity of some prior, unrelated physical acts and a distortion of the policy and prerequisites of conditional water rights.

Finally, the majority opinion states that testimony that the Twin Lakes Company "intended from the outset to take the full amount of water available there" was "without conflict." The defect in this analysis is that the testimony was by an agent for Twin Lakes who was employed in 1969 and made the current claim. Wittemeyer's other testimony clearly indicated that the Twin Lakes Company had no inkling that it could appropriate additional water *until* the present action was contemplated in the early 1970's. Moreover, every landowner, water board, and developer in the state obviously may have a similar abstract intent to acquire all water that is available. Such an intent is not enough. To allow such an "open-ended" intention to appropriate to be substituted for the traditional concept of an intention to appropriate a specific quantity for a specific use is to abandon the foundation of our water law. We have always insisted on concrete intentions to achieve concrete results. The testimony regarding an unbounded intent to appropriate was thus not only patently self-serving, but irrelevant.

Accordingly, I would affirm the water judge.

MR. JUSTICE LEE and MR. JUSTICE CARRIGAN have joined in my dissent.